FILED
2026 Sep-03 PM 02:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KEYARAH MCKENZIE SMITH,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**WESTLAKE FINANCIAL SERVICES,**<br><br>**Defendants.** | }<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>} | **Case No.: 5:25-cv-00545-MHH** |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Keyarah Smith filed this lawsuit against Westlake Financial Services, a company that financed her purchase of a used automobile. (Doc. 14). Ms. Smith drafted the complaint in this matter without the help of an attorney. Ms. Smith asserts claims under the Fair Credit Reporting Act, Article 9A of the Alabama Commercial Code, and the Alabama Deceptive Trade Practices Act. Ms. Smith also asserts Alabama common law claims for conversion and breach of contract. (Doc. 14).

Westlake has moved to dismiss Ms. Smith's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 18). To resolve Westlake's motion, the Court first summarizes the standards that govern Rule 12(b)(6) motions to dismiss. Then, applying those standards, the Court describes Ms. Smith's factual

allegations in the light most favorable to her. Finally, the Court evaluates Ms. Smith's factual allegations under the federal and state law that governs her claims against Westlake.

**I.**

Rule 12(b)(6) enables a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint against the "liberal pleading standards set forth by Rule 8(a)(2)." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A Rule 8(a)(2) statement of a claim "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2009)).

This is particularly true with respect to *pro se* complaints. Courts must construe *pro se* documents liberally. *Erickson*, 551 U.S. at 94. A district court must hold a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson*, 551 U.S. at 94 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Still, a district court "may not serve as de facto counsel for a party, or . . . rewrite an otherwise deficient pleading in order to sustain an action." *Ausar-El ex.*

*rel. Small, Jr. v. BAC (Bank of America) Home Loans Servicing LP*, 448 Fed. Appx. 1, 2 (11th Cir. 2011) (internal quotations and citations omitted).

When evaluating a Rule 12(b)(6) motion to dismiss, a district court accepts as true the factual allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *See Brophy v. Jiangbo Pharms. Inc.*, 781 F.3d 1296, 1301 (11th Cir. 2015). But "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that "formulaic recitation" of the law, legal conclusions, and "naked assertion[s] devoid of further factual enhancement" cannot establish a plausible claim against a defendant) (quotation omitted). A district court must consider "the pleadings and any exhibits attached to the pleadings." *Swinford v. Santos*, 121 F.4th 179, 186–87 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 204 (2025). A district court also may "consider evidence attached to a motion to dismiss . . . 'if the document is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged.'" *Swinford*, 121 F.4th at 187 (quoting *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024)).

**II.**

In February 2023, Ms. Smith bought a used 2014 Chevrolet Impala from Homewood Auto Sales. (Doc. 14, p. 16). Homewood Auto disclosed that the Impala

"may have undergone prior mechanical or body repair" from damage that "occurred during manufacture, transit, or while in the possession of prior owners or operators." (Doc. 18-1, p. 3). Ms. Smith bought the Impala "**'AS-IS' WITHOUT ANY WARRANTY**" and became "**SOLELY RESPONSIBLE FOR COST OF ANY REPAIRS**." (Doc. 18-1, p. 17) (emphasis in original).

Ms. Smith made a $2,000 down payment on the Impala, and Westlake financed the balance of $14,550.50 and the $2,000 fee for a 24 month/24,000 mile service contract (and a small docketing fee) for a total of $16,567. (Doc. 14, p. 4, ¶8; Doc. 14, pp. 16-18). Westlake loaned Ms. Smith $16,567 at 14.97% APR and charged her a $7,048 financing fee distributed over the 60-month repayment term. (Doc. 14, p. 16). Ms. Smith gave Westlake a security interest in the Impala as collateral for the loan. (Doc. 14, p. 19). Ms. Smith agreed to pay Westlake $393.59 per month for 60 months, totaling $23,615. (Doc. 14, p. 16). The parties' loan agreement provides that, "[i]n the event of theft or damage to the [Impala] that results in a total loss," Ms. Smith would pay the difference "between the amount due under the terms of the Contract and proceeds of [her] insurance settlement and deductibles." (Doc. 14, p. 19). The loan agreement also states that either party "may elect" to arbitrate claims or disputes related to the loan agreement. (Doc. 14, p. 19).

In April 2024, the Impala's engine broke, and Ms. Smith learned that the engine would have to be replaced. (*See* Doc. 14, p. 4, ¶9; Doc. 14, p. 23). Ms. Smith

notified Westlake, and Westlake declined to modify Ms. Smith's loan. (Doc. 14, p. 4, ¶10). That summer, Ms. Smith fell behind on her loan payments. (Doc. 14, pp. 75–77, 87). In the fall, Ms. Smith stopped making payments on the loan. (Doc. 14, p. 77). In November 2024, Westlake notified Ms. Smith that her account was "in serious default" and indicated that the company would take "steps to protect its interest in the secured vehicle . . . including repossession." (Doc. 1-1, p. 56).

On December 5, 2024, Ms. Smith filed an arbitration demand with the American Arbitration Association. (Doc. 14, p. 6, ¶28; Doc. 14, p. 47). Ms. Smith alleged that Westlake "engaged in improper practices related to [her] vehicle, which [was] inoperable due to [a] serious mechanical issue." (Doc. 14, p. 48). She sought $8,705.10 in damages. (Doc. 14, p. 48). Westlake declined to pay the arbitration fee because the company contended that the matter could be resolved in small claims court. (Doc. 14, p. 6, ¶29; Doc. 14, pp. 53–54, 57–61); *see* AAA CONSUMER ARB. R. 9 (2014) ("If a party's claim is within the jurisdiction of a small claims court, either party may choose to take the claim to that court instead of arbitration.").[1]

[1] Ms. Smith paid the $225 arbitration demand filing fee on February 1, 2025. (Doc. 14, p. 47). When Westlake asserted the jurisdiction of a small claims court, the arbitrability of Ms. Smith's claim became an issue for the arbitrator to decide. (Doc. 14, p. 53). The AAA requested that Westlake pay the company's $375 portion of the filing fee and a $300 expedited review fee for review of the arbitration clause. (Doc. 14, p. 62). On February 5, 2025, Ms. Smith notified the AAA that the parties would litigate the matter in district court. (Doc. 14, p. 62). The AAA concluded that the matter was withdrawn and closed the file. (Doc. 14, p. 62).

In late January 2025, Westlake repossessed the Impala. (Doc. 14, p. 4, ¶11). On February 4, 2025, Ms. Smith filed a Consumer Financial Protection Bureau complaint against Westlake. (Doc. 14, p. 6, ¶24; Doc. 14, pp. 65–67).[2] The CFPB transmitted Ms. Smith's complaint to Westlake. (Doc. 14, p. 6, ¶24; Doc. 14, pp. 65–68).

In a letter dated February 6, 2025, Westlake responded to Ms. Smith's complaint. (Doc. 14, p. 69). Westlake informed Ms. Smith that the company does not "physically check or test the vehicles" it finances. (Doc. 14, p. 69). Westlake explained that "[i]t [was] the dealer's responsibility to ensure that vehicles it sells are roadworthy" and that buyers should "thoroughly inspect" vehicles before purchase. (Doc. 14, p. 69). Westlake indicated that Ms. Smith could file a claim against the dealership where she bought her vehicle and that Westlake would "participate in any such investigation as required." (Doc. 14, p. 69).

Westlake attached to its response a notice dated January 26, 2025 that indicated that Westlake intended to sell the Impala. (Doc. 14, pp. 78–79). In the notice, Westlake informed Ms. Smith that the company intended to sell the Impala at a private sale after 8:00 a.m. on February 10, 2025 and apply the proceeds of the

[2] Ms. Smith filed a second CFPB report against Westlake on February 17, 2025. (Doc. 14, pp. 81–83). The CFPB marked the complaint as a duplicate on February 18, 2025. (Doc. 14, p. 83).

sale to Ms. Smith's loan balance. (Doc. 14, p. 78). Westlake explained that Ms. Smith would owe the remainder of her loan's balance. (Doc. 14, p. 78). Westlake noted that Ms. Smith had the right to redeem the Impala before the company sold it but did not give Ms. Smith instructions to retrieve personal property she had left inside the car. (Doc. 14, p. 5, ¶14; Doc. 14, p. 78). Westlake did provide a toll-free telephone number and address and indicated that Ms. Smith could use the contact information to request "more information about the sale of the Vehicle." (Doc. 14, p. 78).

On February 10, 2025, Westlake charged off Ms. Smith's remaining debt and closed Ms. Smith's account. (Doc. 14, pp. 77, 86–88).[3] When Westlake charged off Ms. Smith's debt, her account had a $16,947.60 deficiency balance. (Doc. 14, p. 69). Westlake did not provide a deficiency explanation to Ms. Smith after the company sold the Impala. (Doc. 14, p. 4, ¶13).

Westlake reported Ms. Smith's delinquent loan payments to credit reporting agencies. (See Doc. 14, p. 5, ¶¶ 15, 19). Ms. Smith disputed Westlake's report.

---

[3] "[A] charge-off means the lender or creditor has written the account off as a loss and the account is closed to future charges." EQUIFAX, *What is a Charge-Off?*, https://www.equifax.com/personal/education/credit/report/articles/-/learn/charge-offs-faq/ [https://perma.cc/7MAE-TUZU] (last visited March 12, 2026). A debtor is "still legally obligated to pay" a debt that her lender has charged-off. EQUIFAX.

(Doc. 14, p. 5, ¶ 16; Doc. 14, pp. 26–29).[4] The agencies notified Westlake of Ms. Smith's disputes. (Doc. 14, p. 5, ¶ 17). Ms. Smith's delinquent account with Westlake appears on Ms. Smith's credit report without an indication that she disputes her debt. (*See* Doc. 14, p. 5, ¶ 18).

Ms. Smith alleges that lenders and landlords have denied her applications for credit and housing because of Westlake's reports to the credit reporting agencies. (Doc. 14, p. 7, ¶ 32). At least 11 lenders denied Ms. Smith credit between March 5, 2025 and August 29, 2025. (Doc. 14, pp. 31–42). Some lenders indicated that they denied Ms. Smith's credit application due, in part, to a derogatory event or serious delinquency on her credit report. (*See, e.g.*, Doc. 14, p. 35). Other lenders indicated that they denied Ms. Smith's credit application because Ms. Smith's credit report revealed a high utilization rate of revolving accounts, a high number of credit inquiries, or other reasons for concern. (*See, e.g.*, Doc. 14, pp. 32, 34).

**III.**

"The FCRA 'prevent[s] consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report.'" *Harding v. TransUnion LLC*, No. 24-14006, 2026 WL 111492, at *2 (11th Cir. Jan. 15, 2026) (quoting *Equifax,*

[4] Ms. Smith disputed Westlake's report to Experian in a March 5, 2025 letter, in which Ms. Smith stated that she "ha[d] never been late on this account." (Doc. 14, pp. 26–27). Ms. Smith sent an identical letter to Equifax on April 12, 2025. (Doc. 14, pp. 28–29).

*Inc. v. Fed. Trade Comm'n*, 678 F.2d 1047, 1048 (11th Cir. 1982)). Ms. Smith alleges that Westlake violated the FCRA by failing to investigate after the company received notice that she disputed information regarding her account with Westlake, (Doc. 14, pp. 8–9, ¶¶ 44–53 (citing 15 U.S.C. § 1681s-2(b)). To state a claim for failure to investigate under the FCRA, a plaintiff must "identify[] inaccurate or incomplete information that the furnisher provided to the reporting agency" and "point out 'some facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete.'" *Harding*, 2026 WL 111492 at *3 (quoting *Felts v. Wells Fargo Bank, Nat'l Ass'n*, 893 F.3d 1305, 1313 (11th Cir. 2018)).

Ms. Smith has not plausibly alleged that Westlake reported inaccurate or incomplete information. Ms. Smith complains that Westlake inaccurately reported late payments and continued to report a delinquency on her account after the company charged-off her debt. (*See* Doc. 14, p. 9, ¶ 49). Under the parties' loan agreement, Ms. Smith agreed to pay Westlake $393.59 per month for 60 months beginning in March 2023. (Doc. 14, p. 19). Ms. Smith stopped making payments on her loan in September 2024 and owes Westlake $16,947.60. (Doc. 14, p. 77). Thus, unless Ms. Smith can identify circumstances that would modify her payment obligations, Westlake's late payment and delinquency reports are accurate.

The Impala's engine issues do not modify Ms. Smith's payment obligations. Lenders are not obligated to repair or maintain property that is not in their possession. *See* ALA. CODE § 7-9A-207 (providing that a lender must "use reasonable care in the custody and preservation of collateral in the [lender's] possession"); *Walsh v. Douglas*, 717 So. 2d 807, 810 (Ala. Civ. App. 1998) ("[A] secured party has no duty to exercise reasonable care to preserve collateral unless that person takes possession of the collateral.") (interpreting ALA. CODE § 7–9–207 (1998)).[5] Moreover, under the parties' loan agreement, Ms. Smith had a duty to "keep the [Impala] . . . in good condition and repair" and is liable for the "amount due under the terms of the [loan]" if the Impala suffered damage "that result[ed] in a total loss." (Doc. 14, p. 19). Thus, Westlake did not owe Ms. Smith a duty to repair the Impala or to modify her loan because the Impala needed repairs.

Likewise, Westlake's charge-off does not modify Ms. Smith's payment obligations. Although "[c]harged-off debt is deemed uncollectable and treated as a loss for accounting purposes," a charge-off "does not diminish the legal right of the original creditor to collect the full amount of the debt." *See Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1297 (11th Cir. 2016); *accord Taj Bey v. TransUnion,*

---

[5] Ala. Code § 7-9-207 provides: "A secured party must use reasonable care in the custody and preservation of collateral in his possession." In 2001, the Alabama state legislature repealed Ala. Code §§ 7-9-101 et seq. and replaced it with §§ 7-9A-101 et seq. *See* Act of May 16, 2001, 2001 Ala. Acts 481, 647, § 1.

*LLC*, No. 8:25-CV-02848-WFJ-AAS, 2026 WL 503328, at *5 (M.D. Fla. Feb. 24, 2026) ("[A]dding a delinquency flag to the charge-off debt is not inaccurate, since a debt is charged off only if the consumer has been delinquent in paying it."); *see* 15 U.S.C. §1681c(a)(4) (providing that a credit report may include information about "[a]ccounts placed for collection or charged to profit and loss" up to seven years before the report).

Because Ms. Smith has not alleged circumstances that modified her payment obligations, she has not plausibly alleged that Westlake reported inaccurate information when the company reported her late payments and deficiency balance. Therefore, the Court will dismiss Ms. Smith's FCRA claims.

***

Article 9A of Alabama's commercial code governs transactions where a creditor lends money to a debtor, and the debtor gives the creditor a security interest in personal property – such as a motor vehicle – to secure the debtor's payment obligation. ALA. CODE §§7-1-201(b)(35), 7-9A-109(a)(1). The property securing the debtor's obligation is "collateral." ALA. CODE § 7-9A-102(a)(12). The lender is a "secured party." *See* ALA. CODE §§ 7-9A-102(a)(73). When a debtor defaults on

payment obligations, Article 9A provides the secured party remedies and governs the secured party's exercise of its post-default enforcement rights.[6]

Ms. Smith argues that Westlake violated Article 9A by failing to provide reasonable notice of the company's intent to sell the Impala, failing to provide her an opportunity to collect her personal property from the Impala, failing to dispose of the Impala in a commercially reasonable manner, and failing to provide a post-sale accounting. (Doc. 14, pp. 7–8; Doc. 21, pp. 4–10).

Ms. Smith has not plausibly alleged that Westlake failed to provide reasonable notice of the Impala's disposition. After default, a secured party may repossess collateral and dispose of it in a "commercially reasonable" manner. ALA. CODE §§ 7-9A-609, 7-9A-610(a). The secured party need not notify the debtor before it repossesses collateral. *Felton v. Vroom Auto., LLC*, No. 2:25-CV-00580-RDP, 2025 WL 3025686, at *7 (N.D. Ala. Oct. 29, 2025) (citing *Low Cost Cars, Inc. v. Munn*, 399 So. 2d 277, 280 (Ala. 1981))). The secured party must provide the debtor "reasonable notice" before it sells or otherwise disposes of the collateral. ALA. CODE §§ 7-9A-611(b), (c)(1), 7-9A-610(a). The notification must identify the lender and the debtor, the collateral, the lender's intended method of disposing the collateral,

---

[6] Alabama's Article 9 does not define "default," but instead "leave[s] to the parties' agreement . . . the determination of whether a default has occurred." ALA. CODE § 7-9A-601 cmt. 3. Here, the parties' agreement provides that a default occurs if Ms. Smith "fail[s] to perform any obligation" under the agreement. (Doc. 14, p. 18). Accordingly, Ms. Smith defaulted on the parties' agreement when she failed to make timely payments on her loan.

and the time after which the lender will dispose of the property and indicate that the debtor has a right to an accounting of the amount owed. ALA. CODE § 7-9A-613(a)(1). If the debtor is a consumer, the notification also must include:

> [A] description of any liability for a deficiency of the person to which the notification is sent; a telephone number from which the amount that must be paid to the secured party to redeem the collateral . . . is available; and a telephone number or mailing address from which additional information concerning the disposition and the obligation secured is available.

Ala. Code § 7-9A-614(a).[7]

Construing Ms. Smith's allegations in the light most favorable to her, Westlake notified Ms. Smith that it intended to sell the Impala when Westlake responded to her CFPB complaint on February 6, 2025. (Doc. 18, pp. 65–66, 69, 78–79; Doc. 21, p. 4). Westlake's notice identified the lender and the debtor, the collateral, the intended method of disposing the collateral, and the time after which Westlake would dispose of the collateral. (Doc. 14, pp. 78). The notice informed Ms. Smith that she had the right to redeem the Imapala, that she could learn the balance of her indebtedness, pay her balance, and obtain additional information about the sale by calling the listed phone number, and the notice stated that she would

---

[7] When a debtor incurs an obligation for "personal, family or household purposes," and the collateral is "held or acquired primarily for personal, family, or household purposes," the transaction is a "consumer transaction." ALA. CODE § 7-9A-102(a)(26). If the collateral in a consumer transaction is a good "used or . . . for personal, family, or household purposes," the transaction is a "consumer-goods transaction." ALA. CODE. 102(a)(23)–(24). A "'consumer debtor' means a debtor in a consumer transaction." ALA. CODE § 7-9A-102(a)(22).

be liable for the balance of her indebtedness if the Impala's sale did not cover the remainder of her debt. (Doc. 14, pp. 78–79). Ms. Smith received the notice at least four days before Westlake disposed of the Impala, (Doc. 14, p. 78), and Ms. Smith has not alleged that she attempted to contact Westlake to ask about the Impala's impending sale or to request that Westlake delay the sale. Therefore, Westlake gave Ms. Smith "reasonable notice" of the Impala's sale under the circumstances of this case. *See* ALA. CODE § 7-9A-612.

Likewise, Ms. Smith has not plausibly alleged that Westlake violated Article 9A by failing to give her an opportunity to retrieve personal property and failing to dispose of the Impala in a commercially reasonable manner. Ms. Smith has not cited legal authority that requires a lender to provide a debtor with an opportunity to retrieve personal property from repossessed collateral.[8] Moreover, although Westlake had a statutory duty to dispose of the Impala in a "commercially reasonable" manner, *See* ALA. CODE § 7-9A-610(b), Ms. Smith has not described how Westlake disposed of the Impala or explained why the disposal of the inoperable

[8] Ms. Smith asserts that Ala. Code §§ 7-9A-609(b)(2) and 7-9A-614(3)(B) impose "an affirmative duty to: inventory personal items, store them safely, provide written retrieval instructions, and specify location and hours for retrieval." (Doc. 21, p. 7). Section 7-9A-609(b)(2) authorizes a secured party to take possession of collateral after default without judicial process if the secured party proceeds without breach of the peace. Section 7-9A-614(3)(B) provides an example of an adequate notice of sale. These provisions do not require secured parties to provide a debtor an opportunity to retrieve personal property located inside a repossessed vehicle or other collateral.

vehicle was not commercially reasonable. Ms. Smith's conclusory allegations regarding the Impala's sale do not state a plausible claim under § 7-9A-610. *See Ashcroft*, 556 U.S. at 678.

Ms. Smith has not stated a claim against Westlake for failure to provide a post-sale deficiency explanation. Under Ala. Code § 7-9A-616, a lender must provide a consumer who is liable for a deficiency an explanation of the amount owed after the collateral's disposition and "before . . . [the lender] first makes demand in a record on the consumer . . . for payment of the deficiency." ALA. CODE § 7-9A-616(b)(1)(A). A lender "does not have to send an explanation of deficiency . . . if [they] do[] not attempt in writing to collect the deficiency." ALA. CODE § 7-9A-616, cmt. 1. Here, Ms. Smith does not allege that Westlake sent her a demand for payment or otherwise attempted to collect a deficiency from her after Westlake sold the Impala. Therefore, Westlake was not obligated to send Ms. Smith a deficiency explanation.

For these reasons, the Court will dismiss Ms. Smith's Article 9A claims.

***

The Alabama Deceptive Trade Practices Act allows "consumer[s]" to sue persons who engage in an "unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE §§ 8-19-5(27); 8-19-10.

The act defines a "consumer" as a person "who buys goods or services for personal, family or household use." ALA. CODE § 8-19-3(2). Thus, "to assert a cause of action against [Westlake] under this statute," Ms. Smith must allege that Westlake's loan "fit[s] within the statute's definition of a good or service.'" *Felton*, 2025 WL 3025686, at *4 (quoting *Deerman v. Fed. Home Loan Mortg. Corp*., 955 F. Supp. 1393, 1399 (N.D. Ala. 1997), *aff'd sub nom. Deerman v. Fed. Home Loan Mortg*., 140 F.3d 1043 (11th Cir. 1998)).

A loan is not a good or service under the ADTPA. *Felton*, 2025 WL 3025686 at *4. The ADTPA does not include financing a vehicle or similar lending transactions within the definition of goods or services. *See* ALA. CODE § 8-19-3(3) (defining goods to include "property, tangible or intangible, real, personal, or any combination thereof, and any franchise, license, distributorship, or other similar right, privilege, or interest."); ALA. CODE § 8-19-3(7) (defining services to include "[w]ork, labor, and other services, including but not limited to services furnished in connection with the sale or repair of goods."). Moreover, the act "strong[ly] indicates that the Alabama legislature did not intend to include loans . . . within the definition of goods or services for purposes of this statute" because "[m]ost loans . . . are made by banks or affiliates of banks," and ADTPA exempts "banks and affiliates of banks" that are regulated by certain state or federal authorities from liability. *Deerman*, 955 F. Supp. at 1399–1400; *see* ALA. CODE § 8-19-7(3).

Accordingly, Ms. Smith cannot state an ADTPA claim against Westlake because the ADTPA does not apply to consumer loan transactions. *Accord Deerman*, 955 F. Supp. at 1399–1400 (holding that consumers could not sue their mortgage lender under the ADTPA); *Felton*, 2025 WL 3025686 at *4 (holding that a consumer could not sue his car lender under the ADTPA).

For these reasons, the Court will dismiss Ms. Smith's ADTPA claim.

***

A claim for conversion requires "(1) a wrongful taking, (2) an illegal assumption of ownership, (3) an illegal use or misuse of another's property, or (4) a wrongful detention or interference with another's property." *Synergies3 Tec Servs., LLC v. Corvo*, 319 So. 3d 1263, 1272 (Ala. 2020) (internal quotation omitted). A person who lawfully takes possession of another's property does not convert the property unless the property's owner demands that he return it, and he refuses to do so. *Stallworth v. Cont'l Real Est. Mgmt., Inc.*, 582 So. 2d 534, 537 (Ala. 1991).

Here, the parties' contract provided that, if Ms. Smith defaulted on her loan, Westlake could repossess the Impala and "take possession of personal property left in or on" it. (Doc. 14, p. 19). Ms. Smith defaulted on her loan when she stopped making payments. Thus, Westlake's repossession of the Impala and the personal property inside the vehicle was not wrongful. Ms. Smith has not alleged that she

timely demanded that Westlake return her personal property. Accordingly, Ms. Smith has not plausibly alleged a claim for conversion, and the Court will dismiss Ms. Smith's conversion claim.

***

Ms. Smith alleges that Westlake breached the parties' contract because the company refused to arbitrate her dispute. (Doc. 14, p. 10). To state a breach of contract claim, a plaintiff must allege "'(1) a valid contract binding the parties; (2) the plaintiff['s] performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.'" *Laborde v. Citizens Bank, N.A.,* No. SC-2025-0014, 2025 WL 3684583, at *5 (Ala. Dec. 19, 2025) (pending publication) (quoting *Shaffer v. Regions Fin. Corp*., 29 So. 3d 872, 880 (Ala. 2009)). Thus, a plaintiff ordinarily must allege "either that [s]he 'has performed, or that [s]he is ready, willing, and able to perform under the contract'" to recover for breach of contract under Alabama law. *See Laborde,* 2025 WL 3684583, at *5 (quoting *Beauchamp v. Coastal Boat Storage, LLC*, 4 So. 3d 443, 450 (Ala. 2008)).

Yet a plaintiff's nonperformance does not preclude a breach of contract claim based on a contractual provision that the parties' designed to operate after a default. *See Laborde,* 2025 WL 3684583, at *5. For instance, in *Laborde*, the Alabama Supreme Court found that a consumer who defaulted on his mortgage could sue his

mortgage lender for breaching a contract by foreclosing on the mortgage without providing the consumer an opportunity to cure his default. *Laborde,* 2025 WL 3684583, at *6. The Alabama Supreme Court explained that the parties expressly contemplated and addressed the possibility of default and designed the cure provision to operate after default. Because the parties intended the obligation to apply after default, the consumer's default did not prevent him from enforcing the cure provision against his lender. *Laborde,* 2025 WL 3684583, at *6.

Ms. Smith's late and missed payments do not preclude her breach of contract claim based on Westlake's refusal to arbitrate her claim because parties design arbitration provisions to operate after a default. Arbitration agreements give parties "the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011). When parties agree to arbitrate disputes, they contemplate and address the possibility that a dispute may arise because a party breached the contract. Thus, arbitration provisions, like the contractual cure clause in *Laborde*, are designed to apply after a breach of contract. Accordingly, Ms. Smith's default does not prevent her from suing Westlake for breaching the arbitration clause.

Moreover, "[t]he Federal Arbitration Act creates a strong presumption in favor of arbitration and any doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration." *Carroll v. W.L. Petrey Wholesale Co.*, 941 So. 2d 234, 236–37 (Ala. 2006) (quotation omitted). If lenders like Westlake were able to avoid arbitration because a consumer defaulted on a loan agreement, then consumers' contractual arbitration rights would be substantially limited. *See Laborde*, 2025 WL 3684583, at *6. Given the presumption favoring arbitration, the Court declines to adopt a reading of the parties' agreement that would allow Westlake to bypass arbitration based solely on Ms. Smith's late and missed payments.[9]

Ms. Smith's remedies for Westlake's alleged breach of the arbitration provision are "not limited to filing a motion to compel arbitration." *See Strickland v. Chase Bank USA, Nat'l Ass'n*, No. 1:08-CV-3270-WSD-RGV, 2009 WL 10712253, at *3 (N.D. Ga. Dec. 31, 2009), report and recommendation adopted, No. 1:08-CV-3270-WSD, 2010 WL 11647667 (N.D. Ga. Feb. 9, 2010). Ms. Smith has alleged that Westlake caused her damage by refusing to arbitrate because she paid an arbitration filing fee and because her claim resolution was delayed. (Doc. 14, p. 10). Thus, Ms. Smith has sufficiently alleged damages to support her breach of contract claim.

[9] Courts typically consider arbitration clauses separately from the contract as a whole. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 150 (2024). An arbitration clause "will be enforced unless . . . specifically challenged." *See Regions Bank v. Rice*, 209 So. 3d 1108, 1111 (Ala. 2016) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71–72 (2010)). Thus, a party's right to enforce an arbitration clause is often broader than their right to enforce other rights under the contract.

IV.

For the above reasons, the Court grants in part and denies in part Westlake's motion to dismiss. The Court dismisses Ms. Smith's FCRA, Article 9B, ADTPA, and conversion claims. Ms. Smith's breach of contract claim will go forward. Pursuant to Section III of the initial order in this case, (Doc. 11, pp. 4-6), within 14 days of this order the parties shall please submit a Rule 26(f) report and email to chambers a proposed scheduling order to govern the deadlines in this matter.

Ms. Smith's renewed motion for preliminary injunction, Westlake's motion to strike Ms. Smith's reply brief, and Ms. Smith's motion for a ruling are moot. (Docs. 22, 27, 28). The Clerk of Court shall please TERM Docs. 18, 22, 27, and 28.

**DONE** and **ORDERED** this September 3, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE